222 P.2d 805

OROSCO v. POARCH et al.

No. 5321.

Supreme Court of Arizona.

Decided Oct. 9, 1950.

Theodore G. McKesson, Thomas P. Riordan, James D. McKesson, all of Phoenix, for petitioner.

Robert Yount, of Phoenix, H. S. McCluskey and Donald J. Morgan, of Phoenix, of counsel, for respondent Industrial Commission.

PHELPS, Justice.

A motion for rehearing was granted in this case for the purpose of correcting an erroneous statement in the original opinion concerning the geological and chemical character of silicon dioxide and any erroneous conclusions of law or fact naturally or necessarily flowing therefrom. We adopt as a part of this opinion on rehearing the statement of facts and the quotations from the evidence in the original decision, the same as if they were incorporated herein.

In our original opinion we unfortunately relied solely upon the record made by both counsel for the commission (acting as Referee) and counsel for the applicant as our source of information concerning the character of silicon dioxide and we especially relied upon the evidence elicited by the Referee to the effect that silicon dioxide results from the oxidation of silica, thus making a clear distinction between silica and silicon dioxide. Basing our opinion upon that evidence we said that silicon dioxide dust could only come into existence after an oxidation of silica.

The fact is that silica and silicon dioxide ($SiO_2$) are identical, the one being the geological and the other the chemical name for the same thing. Quartz is crystallized silicon dioxide. Quartz is pure silica. Quartz dust and silicon dioxide dust are identically the same thing.

Silicon (Si) forms 28.06% of the earth's crust and exists only in combination either as an oxide or with elements to form silicates. In these two forms it is the predominating constituent of all but calcareous rock. As silica ($SiO_2$) or quartz it forms one of the most indestructible natural compounds and hence is to be found as a prevailing constituent in nearly all sands and soil. See "Rocks, Rock Weathering and Soils" pages 4 and 5 by George P. Merrill, a recognized authority on this subject; also Webster's New International Dictionary, Second Edition.

The above scientific knowledge, admittedly newly acquired by attorneys for petitioner, is confirmed by briefs amici curiæ. These briefs are sufficiently exhaustive in their treatment of the subject to form the basis of a liberal education concerning the character of silica, silicates, silicon and silicon dioxide, for which we are deeply grateful.

Counsel for the commission in its brief in response to applicant's motion for rehearing declines to accept any responsibility for the error committed by the court as to the character of silicon dioxide dust or to acknowledge ignorance of its character although the record shows that it was through the questioning of the Referee for the commission that a distinction was made between silica and silicon dioxide.

Counsel for the commission devoted most of his brief on the motion for rehearing in this case to a criticism of the rules we laid down in the cases of Utah Construction Co. v. Berg et al., 68 Ariz. 285, 205 P.2d 367, and Phelps Dodge Corp. v. Ford et al., 68 Ariz. 190, 203 P.2d 633. In those cases the same counsel sought to have this court declare the commission to be omniscient and omnipotent in the field of judicial notice unshackled by any of the limitations so wisely thrown around courts of record for the protection of individual liberties and property rights. This court declined to agree that such powers reside in the commission and we now reaffirm the rule laid down in those cases to the effect that the law gives to the commission the power to take judicial notice of such matters only as it gives to courts of record and that an applicant for compensation under the Occupational Disease Act of Arizona must assume the burden of establishing all the material matters necessary to the granting of an award. We rejected in the Ford case the contention of the employer that chapter 25, Session Laws of 1943 relating to the ventilation of mines and the prevention of hazardous dust conditions therein was intended to establish a rule of evidence in silicosis cases or to establish a yardstick

436

by which the presence of silicon dioxide dust in harmful quantities must be ascertained. We said in that case, however, that there must be some competent evidence of the presence of silicon dioxide dust in harmful quantities before an award could be made. We now reaffirm that rule.

■ We further stated in the Berg case that what amounts to a harmful quantity of silicon dioxide dust must be determined by its harmful effect upon the individual rather than upon the quantity present and that what may not be harmful to one person may be to another.

■ We now hold that where an applicant for compensation under the Occupational Disease Act of Arizona, A.C.A. 1939, § 56-1201 et seq., shows by competent evidence (1) that he is suffering from silicosis; (2) that within the past ten years immediately preceding the disablement he has worked at least 1,200 shifts either in underground mining or upon the surface within this state; (3) that total disability resulted within two years from the last day upon which the employee actually worked for the employer against whom the compensation is claimed and that applicant worked at least 60 days for such last employer; (4) that such mining operation or surface work was in quartz or primarily quartz formation, and (5) that dust arising from such operation was present in appreciable quantities, that a prima facie case is made and that the commission under the provisions of section 56-1213 (c), A.C.A.

1939, may presume that such dust existed in harmful quantities and that such a showing is sufficient to authorize an award for compensation.

With these principles in mind and in the light of the knowledge counsel for the commission had at the time of the hearing before that body concerning the character of silicon dioxide and silicon dioxide dust and its identity with quartz; and in the light of the knowledge the court now has concerning the subject let us examine the evidence in this case to see if a different result can be reached.

■ The applicant claimed in his petition that he worked 240 shifts in the Monte Cristo Mine. He testified he worked from January 1 to August 1948. His son testified he worked until August 4th and that he worked every day six days a week. He also stated he worked a lot of overtime. This latter statement was confirmed by the payroll stubs a part of which were produced by applicant as evidence in this case. These stubs also confirm his statement that he worked until August 4th. He testified that he was sure he worked over 200 shifts at the Monte Cristo but was not sure that it amounted to 240 as claimed by him. The commission found that he worked 137 shifts only, basing the finding upon the fact that the applicant was only able to produce payroll stubs showing 137 shifts. The commission classified these shifts as possible exposure but declined to find that applicant was actually exposed to silicon dioxide dust

in this mine. We are of the opinion that the undisputable evidence shows that applicant worked 200 shifts, only 12 of which were on the surface. Applicant therefore should have been allowed at least 188 shifts at the Monte Cristo Mine. We further believe the evidence under all the circumstances justifies a finding of exposure to silicon dioxide dust in that mine. There is evidence that there was a lot of silica in the mine. Also that it was dusty.

We will now consider the evidence concerning the work done by applicant at the Groom Mine. Here again applicant's rights were not protected. Exhibits 13, 14 and 15 in the record consisting of three verified letters from Thomas Potter, G. C. Wentworth and R. V. Bouden, respectively, and the testimony of R. V. Bouden at the hearing show that applicant began work at the Groom Mine in October 1938 (no effort was made to ascertain what time in October he began work) and worked until the mine closed in 1940 which, according to the testimony of C. J. Murdock, State Mine Inspector, was on March 9, 1940. This would indicate that applicant worked 17 months and 9 days if we count the month of October, 1938. If we assume further that he worked six days a week during this period he would have worked a total of approximately 450 shifts. Applicant put in a claim for 240 shifts. Under the following questioning by his counsel that figure was reduced to 230 shifts:

"Q. You worked for R. L. Beals? A. Correct.

"Q. What kind of work was that? A. Mining.

"Q. All underground? A. Yes, sir.

"Q. That was 230 shifts? A. Yes, sir."

The Referee accepted this reduction in the claim without asking a single question of applicant concerning the number of shifts worked by him at the Groom Mine or whether he worked regularly each week.

■ While we have repeatedly held that the burden is upon an applicant for compensation to establish all the material matters necessary to the granting of an award and we now reaffirm that rule, let us observe here that the Referee is neither a protagonist nor an antagonist of the applicant. On the other hand it is his bounden duty in conducting these hearings to cause to be developed, in so far as he is able to do so by proper questions or other means then available to him, all the facts relating to applicant's claim for compensation. That duty is just as positive as the one imposed upon the counsel for the applicant. The entire record in the case indicates that applicant is an uneducated man and had no accurate knowledge of the number of shifts he worked for any of his employers. He, of course, knows he worked but he has no definite knowledge as to how many shifts he worked for anybody.

■ With the information before the Referee and the attorney for the applicant

that applicant had worked for the Groom Mine from October 1938 to March 9, 1940 and in so far as the evidence shows he may have worked six days a week throughout the entire period, not one question was asked by either the Referee or counsel for applicant to ascertain whether the work was steady or intermittent. Instead the actual number of shifts claimed to have been worked by applicant was reduced 10 shifts by the leading questioning of counsel. The commission allowed 230 shifts. When counsel for applicant by a leading question, arbitrarily reduced applicant's claim 10 shifts some effort should have been made under the circumstances to correct it. By proper questioning we are of the opinion the number of exposed shifts worked could have been shown to be much greater than the number claimed. Both the Referee and his own counsel owed applicant the duty to ascertain as nearly as possible the number of shifts he worked at the Groom Mine.

Applicant next claims that he worked 130 shifts at the Marquitta Mine. The evidence shows that he worked in this mine under ground from March 1, to September 15, 1947, or a total of six and one-half months which at 26 shifts per month would make 169 shifts. Applicant was asked the following questions about this work:

"Q. Approximately how many shifts did you put in that mine? (Meaning the Marquitta Mine) A. I guess it was better than 200.

"Q. Your petition here says 130. You had at least that many? A. That might be correct. I don't know.

"Q. That was from June 1947 to October 1947, a total of 130 shifts. Is that correct? A. I don't think it is. It was the 1st of March, 1947 until September 1947, the 15th of September."

No attempt was made by any one to determine the actual number of shifts worked in the Marquitta Mine. Further along during the course of the hearing in a summary of the shifts worked the following questions were asked applicant by his counsel:

"Q. You worked for the Marquitta Mine from June 1947 to October 1947, 130 shifts. Were they underground? A. Yes, sir, all underground."

This question was asked notwithstanding the fact that applicant had testified that he worked from March 1, to September 15th in the Marquitta Mine. The commission allowed 130 shifts.

We are of the view that the applicant should have been allowed 169 shifts at the Marquitta Mine instead of 130. A reasonable inference to be drawn from applicant's testimony is that he was steadily employed during that period.

Applicant claimed 300 shifts of exposure while working for Charles C. Herr at the Wickenburg Ore Market. The business of the ore market was the crushing of

ore mined in the small mines in the vicinity of Wickenburg. The evidence is to the effect that in these small mining operations they followed the quartz veins in order to get the higher values, that this was the only way that these mines could be successfully operated. The evidence is also to the effect that the crushing of this ore produced a very bad dust condition, much worse than in the mines themselves. The ore crushed, being primarily quartz, it follows that the dust caused thereby contained large quantities of silicon dioxide dust and the commission should therefore have allowed 300 shifts of exposure in this operation. It rejected the claim entirely.

The commission allowed the applicant 154 shifts of proved exposure while working for the Camp B Mine; 90 shifts while working for Steven Loncan; 30 shifts at the Golden Gate Mine and 55 shifts at the Indiana Mine which was all that applicant claimed except that in the Indiana Mine he alleged 60 shifts but testified to only 55 shifts.

Evidence was introduced of other work done by applicant partly in underground mining but was for the most part in surface ditches without showing the character of the formation in which he worked or that the work was in any dust whatever. Inasmuch, however, as the award must be set aside we will not prolong this opinion by discussing different operations separately.

The total number of shifts of exposure found by the commission was 689. The claim of 300 shifts should have been allowed for the work done at the Wickenburg Ore Market for the reason that the evidence is uncontradicted that the ore market was engaged in crushing quartz ore and that the dust was bad, worse than in the mines. The commission should have allowed at least 188 shifts of exposure in the Monte Cristo Mine and 169 shifts instead of 130 at the Marquitta making a total of 1,216 shifts of exposure.

In our original opinion we referred to a statement in the Berg case that there are four distinct types of silicosis recognized by the medical profession and that only one of these types is compensable under the statutes of Arizona. The accuracy of this statement has been challenged in the briefs amici curiæ as not supported by medical association findings. This statement was not necessary to the conclusion reached either in the Berg case or in the instant case and was therefore improvidently incorporated therein.

For the reasons above stated the findings and award of the commission are set aside.

LA PRADE, C. J., and UDALL, STANFORD and DE CONCINI, JJ., concurring.