MILWAUKEE ELECTRIC RAILWAY & TRANSPORT COMPANY, Appellant, vs. INDUSTRIAL COMMISSION and another, Respondents.

*January 12—February 6, 1951.*

For the appellant there was a brief by *Shaw, Muskat &* *Paulsen,* and oral argument by *Van B. Wake,* all of Milwaukee.

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

*Jack A. Berland* of Milwaukee, for the respondent Walter Neulreich, Sr.

MARTIN, J. The sole question in this case is whether there is any credible evidence to sustain the award of the Industrial Commission. Appellant asserts that each of the following findings of fact is unsupported by the evidence and based upon conjecture and speculation:

"That such work exposed the applicant to fractionated silica;

"That his work increased the exposure to silica over any hazard that one would normally experience in the use of public streets;

"That as a result of such employment applicant sustained injury in the nature of silicotuberculosis; and

"That such injury arose out of and occurred in the course of applicant's employment for respondent."

Neulreich was employed by the Milwaukee Electric Railway & Transport Company at welding and grinding streetcar rails. During the winter months he was occasionally employed at spreading sand. He worked primarily at streetcar intersections, mostly in downtown Milwaukee. Sand was released by the streetcars to aid in braking. Before Neulreich started welding and grinding operations, it was necessary to clean the rail with an eight-inch brush equipped with steel bristles. The cleaning of the rails was a continuous operation. Neulreich testified:

"*A.* Every time a streetcar comes by it tracks more dirt in there and every time you put down a bead that coating of the rods forms a deposit on top of your bead—your slag. That crystallizes. That has got to be chipped off unless the streetcar does that for you, but the dirt, dust, crystals, you brush that off before you start welding again. You have

got to have clean steel before you start the operation, no matter how often you get up you got to brush it maybe a thousand times a day. You find out, exactly too much.

"*Q.* And you say that operation of brushing will continue and be constant so long as you worked at one particular spot, is that correct? *A.* As long as I work welding down I have to brush ahead of time.

"*Q.* Every time the streetcar passes it requires another brushing? *A.* Another brushing to get the deposit of the coating off and the dirt that is dragged in by the streetcar wheels."

One of his helpers for a short time testified that the brush was used "Every ten minutes or every five minutes, something like that; you use it often though."

Before beginning the welding operation it was necessary to preheat the rails with Propane gas. The heat would be so intense that the concrete would crack. After examining Neulreich on July 23, 1948, Dr. Elston L. Belknap went to look at the actual operation of grinding and welding and testified:

"Preceding the welding, a preheating unit fired by artificial gas was applied to the rails where the weld would take place. The heating is so intense, it would frequently chip off—in fact, this occurred while I observed the operation. After the streetcar passed, the granite chips were pulverized by the wheels. The resultant powder usually blows away like ordinarily smooth powders by air. We know, of course, that granite contains thirty-five per cent free silica."

Neulreich testified that the torch used for heating the steel to get it red hot for the cutting process required forty pounds of air pressure and "you know what that does to the dust to make it fly." He also testified that when grinding he got the dust from the grinding operation, as well as the street dust from streetcars and automobiles.

Air samples for the determination of dust conditions were taken at Jackson and Wells streets by an engineer with the

industrial hygiene division of the state board of health. The engineer testified that the street at the intersection was more dirty than normal, but Neulreich testified that the place was less dusty and dirty than most of the places he worked— "that was a drawing room compared with other intersections."

The dust count revealed a concentration of 4.7 millions of particles per cubic foot of air during the grinding of a top-weld operation. One sample of the street dust swept from areas near the streetcar rails at the corner contained thirty-seven per cent free silica, while another sample contained twenty-four per cent.

The evidence establishes that in his work, Neulreich was exposed to the sand that was in street dust, to that placed on the streetcar tracks for braking purposes, to that brushed from the rails with a steel brush, to that thrown up during grinding operations, and to the free silica that was liberated when preheating the rails.

While engaged in the grinding operations on the streets he was required to bend close over the rails, with his face about eighteen inches from the rails. A mask, which consists of a hood and certain lenses, to protect the face and eyes was used only during the welding process. He was exposed to the sand at close range and while working in a fixed position. It is a matter of common knowledge that one who is required to remain in close proximity to the source of sand and dust is subjected to a more intense exposure than a person who may move away from the source of danger. Dr. Enzer testified that "the passages, the openings of his respiratory system were more closely at a level of the street than many other individuals" and "he worked at it constantly."

Dr. Enzer testified as follows in differentiating between the exposure to which a street cleaner was exposed:

"*A.* Number one, they move about a great deal; they don't work in a fixed position where the dust is elaborated in clouds, in fine, fractionated elements; two, they don't work as close to the source of that dust; three, they do not engage in operations which elaborate dust, and fourth, I would say that if such an individual would ultimately show signs of silicosis in his lungs, then I would say he was also exposed to sufficient amount of silica to produce silicosis."

Neulreich at the time of the first hearing was sixty years of age. In 1919, at the age of thirty-one, he started at his work for the Transport Company and, with the exception of eighteen months from 1925 to 1927 when he was employed in Milwaukee industrial plants, he continued until contracting an acute illness in 1947.

The court has recognized prolonged exposure to silica as a causative factor in producing disability. In *Zurich Gen. Acc. & L. Ins. Co. v. Industrial Comm.* (1930), 203 Wis. 135, 142, 233 N. W. 772, it was stated:

"The deceased had been employed for eleven years in a dusty occupation. It is a matter of common knowledge that such occupations give rise to lung troubles and that a continued exposure increases the difficulty and greatly diminishes the chances of recovery. While this does not appear in the evidence, it is a matter of common knowledge." See also *Crucible Steel Casting Co. v. Industrial Comm.* (1936), 220 Wis. 665, 667, 265 N. W. 665; *Milwaukee M. & G. I. Works v. Industrial Comm.* (1942), 239 Wis. 610, 613, 2 N. W. (2d) 197.

The evidence establishes that Neulreich was exposed to the inhalation of free silica in the course of his employment, that the exposure was at close range while he was working in a fixed position, and the exposure continued over a great number of years, and is ample to sustain the finding that his work increased the exposure to silica over any hazard that one would normally experience in the use of public streets.

The medical testimony is as follows: Dr. Norbert Enzer examined Neulreich on September 2, 1948, and reviewed the X rays and records at Muirdale sanatorium. He testified:

"My conclusions were that Neulreich had a pulmonary fibrosis known as pneumoconiosis and that his history would justify the diagnosis of silicosis. The characteristics of the pattern of the fibrosis in the lungs will justify the further diagnosis that he has had a complicating infection in that lung so that in my judgment he has a form of infected silicosis because of the persistency of the pattern in the lungs and the failure of the areas of density to change over a long period of observation the likelihood that that infection was due to tuberculosis is strengthened by those findings. This is further supported by the history of fever and by the finding of a positive guinea-pig test for tuberculosis."

He was asked:

"Q. Doctor, do you have an opinion within a reasonable certainty as to the cause of the disease with which Mr. Neulreich is presently afflicted? A. Yes, I have an opinion.
"Q. And what is that opinion? A. My opinion is he is suffering from silicosis complicated by tuberculosis contracted as a result of his occupation at the transport company."

In a report filed in accordance with the provisions of sec. 102.17 (1) (as), Stats., Dr. Enzer gave his diagnosis as "chronic silicotuberculosis" and gave as the probable competent producing cause of disability "exposure to silica dust—causing silicosis." In regard to the employer's contention that Neulreich was suffering from siderosis, which is a deposit of iron dust in the lungs, Dr. Enzer testified:

"The totality of his pulmonary picture from an X-ray point of view completely negates the diagnosis of pulmonary siderosis. There is no resemblance at all here to the so-called characteristic picture of a welder's lung . . . but by no criteria personally known, does the X-ray pattern in this case justify a diagnosis of siderosis, and if there is any sider-

osis in this case, it is incidental, and by no means contributes to the basic X-ray pattern, nor does it contribute to this man's disability. The pattern of siderosis is entirely different from that just observed in this case and if one did not have a history of being a welder, one would not think of siderosis so that if there is any factor of iron here, it does not contribute essentially to the basic pattern of the X-ray findings, nor does it contribute in any way to the man's disability, nor is it a factor in the development of his tuberculosis, which tuberculosis at the present time is in the relative quiescent fibrotic stage."

He stated further that the X-ray films alone may be considered as practically irrefutable proof that it is not a case of siderosis; that he was aware of no literature indicating any causal or aggravating relationship between siderosis and tuberculosis, but that tuberculosis could be superimposed on silicosis at any stage, and that he believed Neulreich was afflicted with tuberculosis.

Dr. Enzer testified that there was a limit to the extent that one could make a completely definitive diagnosis of silicotuberculosis in the absence of history; that an X ray suggesting silicotuberculosis would have to be supported by evidence of history of exposure to silica dust:

"Now the opportunity to develop silicosis in my judgment was here. He handled sand. He did grinding. He did welding in the presence of sand and there are already many cases on record, and I have seen some myself, in which there is a combination of silicosis and siderosis of people who have done welding in the presence of sand."

Appellant relies on the dust count referred to earlier in this opinion. Dr. Enzer stated: "A single, isolated study of a dust count is of no value in the determination of what happens in the lungs of a man who has been exposed for many years to a dust hazard." He testified that the details of the kind of exposure are unimportant so long as they establish the presence of sand and if the man has clinical and X-ray evi-

dence of silicosis, then the amount of the sand he was exposed to is adequate for that finding.

Dr. Richard Jahn, a specialist in internal medicine employed at Muirdale sanatorium, first saw Neulreich in March, 1947. He was asked by the examiner:

"*Q*. Based upon your examination and history you have obtained and your examination of the X rays, do you have an opinion at this time, doctor, based on a reasonable degree of medical certainty, and first of all, the nature of his disability? *A*. I do.

"*Q*. And what is your opinion? *A*. Silicotuberculosis."

He testified that it was a typical silicosis case and that the diagnosis made by the entire staff was "silicotuberculosis." He was asked:

"*Q*. Doctor, now I would like to have it clear in your mind, are you satisfied to a reasonable certainty that Mr. Neulreich's employment was the cause of his present condition? *A*. Yes."

The testimony given by Drs. Enzer and Jahn fully supports the commission's finding that disability resulted from the employment. Appellant relies primarily on the testimony of Dr. J. E. Habbe, who specializes in roentgenology, and Dr. E. L. Belknap, who specializes in internal medicine. However, neither ruled out silicosis completely, and both considered that with a history of sufficient exposure to silica they would make a diagnosis of silicosis.

Dr. Enzer testified that factors within the individual himself, such as infection, are important in evaluating any given case:

"If you have two individuals, one of them with absolutely normal lungs, of no sign of infection in those lungs, and another individual who has had some focus of tuberculosis or old pneumonia in the lungs, the latter individual will develop a greater degree of fibrosis over a shorter period of time than the individual who did not have that infected

quality in his lung, providing that they were both exposed to the same concentration over the same length of time."

An individual workman's susceptibility to a particular disease does not make that disease noncompensable. The court upheld an award for dermatitis resulting from an allergy to a cleaning compound in *Kroger Grocery & Baking Co. v. Industrial Comm.* (1942), 239 Wis. 455, 1 N. W. (2d) 802.

It is a well-established rule that the commission's finding on disputed medical testimony is conclusive. *A. D. Thomson & Co. v. Industrial Comm.* (1928), 194 Wis. 600, 602, 217 N. W. 327; *General A. F. & L. Assur. Corp. v. Industrial Comm.* (1937), 223 Wis. 635, 641, 271 N. W. 385; *Crucible Steel Casting Co. v. Industrial Comm., supra* (p. 669).

The commission had the privilege of relying upon the testimony of Drs. Enzer and Jahn to the effect that Neulreich was suffering from silicotuberculosis resulting from his employment, and its finding is conclusive.

The situation here is quite different from that in *Liberty Foundry, Inc., v. Industrial Comm.* (1939), 233 Wis. 177, 184–186, 288 N. W. 752. There the applicant had worked only for about two years in the employ of the employer who was sought to be held for compensation. He was examined when he entered this last employment, and the examination disclosed a first or second degree of silicosis. There was no evidence of any increase in this condition, and under these circumstances this court was compelled to hold that there was no evidence that work for the last employer made any contribution toward the disability.

In *F. A. McDonald Co. v. Industrial Comm.* (1947), 250 Wis. 134, 137, 138, 26 N. W. (2d) 165, it was held that a medical report, which contained a statement merely to the effect that there "might be" a five per cent permanent total disability having a causal relation to the accident suffered by the claimant, but which otherwise negatived such a disability,

did not support a finding of the commission that there was such a disability. It was further held that the commission may not wholly disregard the medical testimony and base a finding of permanent disability on an inference from other facts in the record, where such inference is not sustainable on the basis of common or general knowledge and experience and is contrary not only to all the medical opinion in the case but to all of the medical findings based on actual physical examination of the claimant.

The evidence in *Creamery Package Mfg. Co. v. Industrial Comm.* (1933), 211 Wis. 326, 331, 248 N. W. 140, was held insufficient to show that an employee whose duties required him to travel, except for two days of each week end spent at home, contracted typhoid fever in the performance of his work, where there was no evidence that, during the incubation period of the disease, he had come in contact with, or been in the presence of, any typhoid-infected person, or that he had been in any particular place where any such person had contracted typhoid, or that he had been exposed in any particular place in which he had been, to any such cases, or to typhoid-fouled food, liquid, air, or other possible sources of infection.

No useful purpose would be served in discussing other cases cited by appellant because the facts are entirely different than the instant case.

The findings of the commission, supported by credible evidence, cannot be disturbed.

*By the Court.*—Judgment affirmed.