No. 17,463.

COLORADO FUEL AND IRON CORPORATION *v.* ALITTO ET AL.
(273 P. [2d] 725)

Decided August 23, 1954.   Rehearing denied September 13, 1954.

Mr. CHARLES H. GROVES, Messrs. TIPPIT, HASKELL & WELBORN, Messrs. McCOMB, ZARLENGO & MOTT, for plaintiff in error.

Messrs. GRAHAM & SCHEUNEMANN, for defendant in error Mary Alitto.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK A. WACHOB, Deputy, Mr. PETER L. DYE, Assistant, for defendant in error Industrial Commission.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

PLAINTIFF in error, hereinafter referred to as "employer," seeks by writ of error to reverse a judgment of the district court which affirmed an award of the Industrial Commission of Colorado, herein referred to as the "Commission," in favor of Mary Alitto, here designated as "claimant" or "widow," for compensation benefits on account of the death of her husband, Louis Alitto, to whom we shall refer as "decedent." The widow's claim is based upon the Colorado Occupational Disease Disability Act, chapter 163, S.L. Colo. 1945; section 443, chapter 97 '35 C.S.A., referred to herein as the "Act."

Claimant filed her claim with the Commission alleging her husband, the decedent, died March 2, 1952 from silicosis contracted while in the employ of plaintiff in error, demanding death benefits under the Act.

Decedent was employed by plaintiff in error in its bricklaying operations from 1908 to the time of his death

in 1952. It is not disputed that these operations exposed the employees therein engaged to harmful quantities of silicon dioxide dust. It is admitted that decedent contracted silicosis while employed by plaintiff in error, but it contends this was prior to 1945, at which time he became a master brick mason.

The employer contends decedent was not injuriously or harmfully exposed after that date. The testimony on this issue is in conflict. Lay witnesses who testified on behalf of the widow said decedent worked with the bricklaying gang for at least part of each working day and was thus exposed to harmful quantities of the silicon dioxide dust created by these operations. Employer's lay witnesses testified that decedent avoided the extremely dusty conditions. There was ample competent evidence in the record before the Commission that hazardous exposures continued to exist on the premises of the employer where decedent worked after 1945, when he became a master brick mason of the bricklaying crews.

The pertinent sections of the Act applicable in the instant case, are: "Section 4 (g) 'Injurious exposure' and 'harmful quantities' where used in this act shall be construed as synonymous terms and shall mean that concentration of toxic material which would, independently of any other cause whatsoever (including the previous physical condition of the claimant) produce or cause the disease for which claim is made. Determinations made under this subsection by the Industrial Commission of Colorado shall not be conclusive on either the District or Supreme Courts.

"Section 6. Act Not Retroactive. This Act shall not apply to cases of occupational disease which the *last injurious exposure* to the hazards of such disease occurred before this Act shall have taken effect. (Emphasis supplied.)

"Section 13. Last Employer Liable—Exception. Where compensation is payable for an occupational disease, the

employer in whose employment the employee was last injuriously exposed to the hazards of such disease, and the insurance carrier, if any, on the risk when such employee was last so exposed under such employer, shall alone be liable therefor, without right to contribution from any prior employer or insurance carrier, *provided, however,* that in the case of silicosis or asbestosis the only employer and insurance carrier liable shall be the last employer in whose employment the employee was last exposed to harmful quantities of silicon dioxide (Si $O_2$) dust or asbestos dust on each of at least sixty days or more, and the insurance carrier, if any, on the risk when the employee was last so exposed under such employer."

The duties of a bricklayer at employer's Pueblo mill consist of building, tearing down and re-building, in whole or in part, furnaces, chimneys, soaking pits, etc., with bricks which contain a high percentage of silica and in the performance of which duty silicon dust is created.

The duties of a foreman are similar to those of a journeyman in that he is generally present at the scene of all operations, but acts in a supervisory capacity. The foreman is exposed to practically the same atmospheric conditions as the journeyman. The master brick mason supervises the work of all those engaged in the bricklaying operations. Employer's witnesses, while minimizing the dust conditions, admitted decedent spent a substantial part of each day supervising and inspecting the work of the men under him. It is definitely shown by the evidence that in close proximity to the place where these bricklayers worked there were harmful quantities of silica dust created by these operations.

There was evidence before the Referee of the Commission that as a master brickmason Mr. Alitto ordinarily observed the activities of the bricklaying gangs at a distance of ten to twenty feet from the operations for periods of thirty minutes to one hour for a total of two or three hours a day, and occasionally would go into the

midst of a group to explain the correct method, or a new method, of accomplishing a certain task.

Under the direction of decedent's employer, x-ray pictures of his lungs were taken in 1943; in March 1946, and again in the years 1948 and 1951. Decedent was first advised that he had silicosis in 1944. He was in apparent good health until 1948; worked steadily except for a period of two weeks in September, 1951 when he was ill, until his final illness, which lasted about a week.

Dr. Kauvar was called as an expert witness on behalf of claimant. He testified that he had examined the series of x-rays of decedent's lungs, taken in 1943, 1946, 1948 and 1951. We quote from his testimony: "Q. Doctor, did you note any particular changes in the X-ray series from 1943-1951? A. Yes. There is a progression, what I would call a progression of the silicosis from them more than could be accounted for by a natural progression of the disease. In other words there is more silicosis in 1951 than there was in 1943 on the X-Ray pictures in my mind. That indicates that he had an additional silicotic infiltration between the times of 1943 and 1951."

Dr. Kauvar examined the x-ray films, and testified: "There must have been an increase in the amount (silicotic infiltration) between 1948 and 1951." Obviously more than sixty days elapsed between 1948 and 1951, during which time decedent was steadily employed by plaintiff in error.

Dr. Kauvar further testified: "In my opinion it was not something that was going along from a pre-existing silicosis, but there was more silicosis between 1948 and 1951, and the only thing I can assume is that he had to have an increase in the amount of silicotic infestation or infiltration." He also testified: "I would say the major change occurred between 1948 and 1951."

Expert witnesses called by employer from an examination of the x-ray pictures gave it as their opinion that decedent had tuberculosis. Following introduction of this evidence it was agreed the remains of decedent be

exhumed and a pathologist selected by employer testified that he found no evidence of that disease, and that tuberculosis could not account for the changes appearing in the x-ray pictures taken from 1948 to 1951.

Following the autopsy Dr. Kauvar testified as follows: "Q. Are you still of the opinion, Doctor, in the light of the autopsy and the hospital records, this man was harmfully exposed to silicon dioxide after 1946? A. I would say after 1948, because of the fact that between 1943 and 1948 there is relatively little change in the x-rays, except for emphysema. There is no question that silicosis had previously established this condition. However, the problem is, what happened during those five years in which this patient had no change in the x-rays and in 1948 suddenly developed changes, so therefore I am forced to conclude, even after following the autopsy report, this patient was harmfully exposed following 1948. Q. Is there anything in the autopsy or the hospital records, Doctor, which in your opinion provide a logical explanation for the changes in the x-ray, except additional exposure to silicon dust? A. I think it is a question — I think that is the most probable explanation. In the light of the findings on the autopsy it is probably the explanation."

The witness Mr. Biondolillo testified that from 1945 to 1952 decedent was with the bricklayers on dusty jobs in the soaking pits and blast furnaces. We quote from his testimony: "Q. Did he (decedent) come in the blast furnaces while he was master foreman? A. Yes, he did. Q. After 1945? A. Yes, he did, for the simple reason that when we got into a blast furnace we would always get a bunch of men from the open hearth and the job had to be done in a certain length of time. All right, when he saw this man wasn't doing the right thing, even with the special inspection department there he would go down in the hole, down the ladder, whichever place it was, whichever way was best. Sometimes there was a chute

with two landings and sometimes he would go down and show the men how to put brick up."

He also testified that the dust was "pretty darned thick," and that as master brickmason decedent spent an average of a couple of hours every day with each gang; that on the average day there were three different gangs working. Witnesses called by the employer admitted that decedent, as master brickmason, spent a substantial part of each working day supervising and inspecting the work of the bricklayers, and it is apparent from the record this work was carried on by decedent in close proximity to the bricklaying operations; that decedent was thus exposed to the silica dust created by these operations.

In *Gates Rubber Company v. Tice,* 124 Colo. 595, 239 P. (2d) 611, and *Resurrection Mining Co. v. Roberts,* 127 Colo. 559, 259 P. (2d) 275, we affirmed awards based on lay testimony that dust arising from toxic material was present in appreciable quantities and this fact coupled with expert medical opinion that claimant suffered from the disease and had been harmfully exposed during his employment. That such testimony is sufficient to support an award has been affirmed in the following cases: *Milwaukee Electric Railway Co. v. Industrial Commission,* 258 Wis. 466, 46 N.W. 2d 198; *Harbison-Walker Refractories Co. v. Harmon,* 114 Ind. App. 144, 51 N.E. 2d 398; *Uta-Carbon Coal Co. v. Industrial Commission,* 104 Utah 567, 140 P. (2d) 649; *Oldman Boiler Works v. McManigal,* 58 F. Supp. 697; *Orosco v. Poarch,* 70 Ariz. 432, 222 P. (2d) 805; *Johnstown Coal & Coke Co. v. Dishong,* 198 Md. 467, 84 A. 2d 847.

It is contended by the employer that the Act requires proof not only of injurious exposure after the effective date of the Act, but of such exposure on at least sixty different days.

It was abundantly shown by the testimony that decedent was "harmfully exposed," as that term is defined in the Act, from 1946 until his death in March, 1952.

█ It will be noted that by section 16 of the Act, "if death occurs in the calendar month in which this act becomes effective, the total compensation for disability and death shall not exceed the sum of five hundred dollars." The Act also provides that if death occurs during the next ensuing thirty days such compensation shall not exceed $550. "Thereafter, the total amount of compensation for disability and death shall increase at the rate of fifty dollars ($50) per month * * *. Such progressive increase in the limits upon the total amount of compensation payable for disability and death shall continue," but shall not exceed a total $4,375.00.

It is evident from the language thus employed that the General Assembly intended to provide compensation benefits for exposure continuing for any period after the effective date of the Act. The legislative intent is further accented by section 6 of the Act.

If there had to be a harmful exposure to silicon dust for at least sixty days before liability attached, then there could be no award in any case until after sixty days elapsed from the effective date of the Act.

█ Counsel for the employer state in their brief that, "There is absolutely no evidence showing an exposure to harmful quantities of silicon dioxide dust on sixty different days after January 1, 1946." They ask us to "examine the record" and make our "own determination on this point." We have done so with care, particularly in the light of the positive statement made by counsel for plaintiff in error that the record is devoid of such proof. We find there is ample evidence which supports the findings and award of the Referee of the Commission.

In *Kennecott Copper Corp. v. Industrial Commission,* 115 Utah 451, 205 P. 2d 829, we find this significant language: "The fact that silicosis might have had its origin in the employ of some previous employer, does not exempt the plaintiff from liability. The law recognizes the fact that disablement comes only after years of con-

tinuous exposure in many cases. The statute provides no compensation for the silicosis condition itself, but only for total disability resulting from such malady. The law is premised on the concept that if an employee is accepted into an employment and performs his work successfully for a number of years, and while in such employment he finally becomes totally disabled from silicosis, the employer in whose employment the disability occurs should not be permitted to exempt himself from liability for total disability by asserting that a silicosis condition arose in some prior employment. The disabled employee might have an impossible burden to fix liability. Therefore the statute makes liable only the *last employer* in which employment the employee was last exposed to harmful quantities of silicon dioxide dust during the period specified in the act."

In the Kennecott case, supra, the disabled employee had worked for his employer for some eleven years. While so employed and in 1938, it was discovered by x-ray examination that he had a nondisabling silicosis as a result of his work; he was then reassigned as a car repairman outdoors "on the hill" at which job he worked until July 15, 1946, when he became totally disabled. Following hospitalization he died.

The Utah Occupational Disease Act became effective July 1, 1941. Under the Utah statute, in order to support the commission's award, the record must show that the applicant was exposed to harmful quantities of silicon dioxide dust for a five-year period between 1936 and 1946, and that at least sixty days of such five-year period were subsequent to the effective date of the Act.

"The liability of an employer in whose employ an applicant becomes totally disabled from silicosis, is predicated not on having contracted such ailment in his employ, but for exposing such employee to harmful quantities of the dust. There being a period of nearly 11 years of some exposure to such dust, in view of the circumstances, the commission had a valid basis for its

findings that the quantities were harmful in view of total disability. The award of the commission is therefore affirmed." *Kennecott Copper Corp. v. Industrial Commission, supra.*

In the instant case it is urged that decedent was given a job as master brick foreman and that in this capacity he was not subjected to silicon dust. The record is replete with evidence that he was thus subjected. We again quote from the Kennecott case, supra: "There is also evidence that even while he worked on the hill and on different levels of the open mine, he was exposed to that kind of dust. In fact, there was no other place where he was so exposed during the period of 11 years." Such was the condition under which decedent worked as master brickmason.

The record here discloses that decedent was a faithful and competent employee who during all of his adult life devoted himself to the best interests of plaintiff in error.

As Mr. Justice Stone observed in his dissenting opinion in *Moffat Coal Co. v. McFall,* 117 Colo. 191, 186 P. (2d) 1021: "Employee was killed in an industrial accident. Lives, as well as materials, are consumed in industry. Where dependents suffer loss, compensation for a life consumed should be an obligation at least equal to that for mine props and explosives, and so to provide is a basic purpose of the statute."

We quote from *Harbison-Walker Refractories Co. v. Turks,* 110 Ind. App. 563, 39 N.E. 2d 791: "The Workmen's Occupational Disease Act is a practical statute, having for its purpose the accomplishment of a definite humane purpose. It should be mantled in the spirit of the objective, not shrouded in a haze of over-technical interpretations." We use this yardstick in construing the Colorado Act.

Ours is a court of review, and not a fact finding body. It is the function of the Commission to ascertain the facts in cases before it, and if the findings of fact made by the Commission are sustained by competent

evidence, they will not be set aside or held for naught by either the district court, or this Court. In the instant case there is competent evidence sustaining the finding of the Commission.

We are satisfied from the record in the instant case that claimant by proof over and beyond that required by the Act showed that she was entitled to an award. This being so, the judgment of the district court is correct and is hereby affirmed.