MEDNICOFF, Appellant, v. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS and others, Respondents. [Two appeals.]

*Nos. 121, 122. Argued January 31, 1972.—Decided February 29, 1972.*
(Also reported in 194 N. W. 2d 670.)

For the appellant there was a brief by *Murphy, Shapiro, Gorsky & Dubin,* attorneys, and *Carl L. Dubin* of counsel, all of Milwaukee, and oral argument by *Carl L. Dubin.*

For the respondent Department of Industry, Labor & Human Relations the cause was argued by *James P. Altman,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

For the respondents Columbia Hospital and Employers Mutual Liability Insurance Company there was a brief by *Hart, Wightman & Thurow* and *Walter D. Thurow,* all of Madison, and oral argument by *Walter D. Thurow.*

CONNOR T. HANSEN, J.  October 30, 1960, the appellant, then a woman sixty-six years of age, sustained an injury to her left hip, caused by a fall during the course of her employment at Columbia Hospital. This fact is undisputed.

Appellant endured a prolonged and complicated period of recovery. A detail of the numerous hearings before the department and in the courts is not necessary to resolve the issues presented on this appeal. Likewise a full discussion of the many and varied surgical and medical procedures would serve no useful purpose.

This appeal presents two issues:

(1) Was it error for the trier of fact to disregard total loss of earning capacity when the appellant sustained a relative scheduled injury?

(2) Is the evidence sufficient to support the finding that further medical treatment was not required after July 18, 1966?

*Loss of earning capacity as an element of a scheduled injury.*

The resolution of this issue must necessarily depend upon the application of the appropriate provisions of the Workmen's Compensation Act to the facts of this case.

During the course of the hearings before the department, a number of doctors testified in regard to appellant's disability. One testified that she was not employable and was 100 percent totally disabled. Another testified that to a reasonable medical probability and as a direct result of the accident, the appellant suffered 90 percent permanent disability at the left hip as compared to amputation at that level, and five percent permanent disability at the left knee. He also stated that the appellant was not employable, and from a physical standpoint was unsuitable for any employment. A third doctor testified that the appellant was 75 percent

permanently disabled as compared with amputation of her leg at the hip, and that she was unemployable because most employers would not be willing to hire a person of her combined age and disability. It appears the appellant presently resides at the Milwaukee Jewish Convalescent Hospital.

The department determined that the appellant sustained 90 percent permanent partial disability at the left hip and five percent permanent partial disability at the left knee. There is sufficient credible evidence to sustain the findings of the department. The injury is a relative scheduled injury under the Act.

In *Kurschner v. ILHR Department* (1968), 40 Wis. 2d 10, 161 N. W. 2d 213, this court reversed a finding of the industrial commission where the injury sustained was nonscheduled and the commission based its finding solely on functional impairment without regard to loss of earning capacity. Relying on *Northern States Power Co. v. Industrial Comm.* (1947), 252 Wis. 70, 30 N. W. 2d 217, this court held that loss of earning capacity was a crucial element to be considered in comparing nonschedule injuries to an injury which would cause permanent total disability:

"Thus it appears that the injuries of an applicant (nonschedule but permanent total or partial) are to be compared medically with injuries that would render a person permanently totally disabled for industrial purposes as provided in sec. 102.44 (2), Stats., and *not* to injuries that would totally disable a person functionally without regard to loss of earning capacity." *Kurschner v. ILHR Department, supra,* page 18.

In *Kohler Co. v. ILHR Department* (1969), 42 Wis. 2d 396, 167 N. W. 2d 431, this court reaffirmed the principle of *Kurschner* insofar as it applies to occupational diseases and to other nonschedule and nonrelative injuries.

Appellant would have this court read in the applicability of these decisions to cases of scheduled and relative

disabilities. This court went on to explain in *Kohler* that as a result of *Northern States Power Co.* and *Kurschner,* the effect on earning capacity of nonscheduled and nonrelative disabilities is conclusively presumed, thus relieving an injured employee from establishing an actual wage loss. Similarly, an employee who has sustained a scheduled or relative injury is entitled to recover without the showing of an actual wage loss. *Green Bay Drop Forge Co. v. Industrial Comm.* (1953), 265 Wis. 38, 44, 60 N. W. 2d 409, 61 N. W. 2d 847. However, it is incorrect to conclude that in both situations a trier of fact must consider loss of earning capacity in determining the extent of disability. *Northern States Power Co., Kurschner* and *Kohler Co.,* specifically relate only to the method of computing permanent disability for nonschedule and nonrelative injuries. Where the injury is scheduled or relative, the loss of earning capacity is inherent in the schedule.

If the loss of earning capacity is to be determined by the trier of fact in cases relating to scheduled and relative scheduled injuries as well as in those cases concerning occupational diseases and other nonscheduled and nonrelative injuries, such a result must be accomplished by legislative modification of the language of the statutes. As we shall point out, the language of the applicable statutes, as enacted by the legislature, is such that this court is unable to so construe it as to accomplish the results sought by the appellant.

Sec. 102.52, Stats., contains an enumeration of certain types of injuries giving rise to permanent partial disability and specifies the indemnity to be paid therefor:

"102.52 **Permanent partial disability schedule.** In cases included in the following schedule of permanent partial disabilities indemnity shall be paid for the healing period, and in addition thereto, where the employee is 50 years of age or less, for the period specified, at the

rate of 70 per cent of the average weekly earnings of the employe, to be computed as provided in section 102.11:

"....

"(10) The loss of a leg at the hip joint, 500 weeks;
"(11) The loss of a leg at the knee, 425 weeks;"

Sec. 102.55, Stats., provides for the application of the scheduled indemnity to injuries which are related to the scheduled injuries:

"102.55 **Application of schedules.** (1) Whenever amputation of a member is made between any 2 joints mentioned in the schedule in section 102.52 the determined loss and resultant indemnity therefor shall bear such relation to the loss and indemnity applicable in case of amputation at the joint next nearer the body as such injury bears to one of amputation at the joint nearer the body.

"(2) For the purposes of this schedule permanent and complete paralysis of any member shall be deemed equivalent to the loss thereof.

"(3) For all other injuries to the members of the body or its faculties which are specified in this schedule resulting in permanent disability, though the member be not actually severed or the faculty totally lost, compensation shall bear such relation to that named in this schedule as disabilities bear to the disabilities named in this schedule. Indemnity in such cases shall be determined by allowing weekly indemnity during the healing period resulting from the injury and the percentage of permanent disability resulting thereafter as found by the department."

Sec. 102.44, Stats., defines permanent total disability and sets forth a method for determining permanent partial disability for nonscheduled injuries.

Appellant argues that because this court has held loss of earning capacity to be a necessary consideration in computing the extent of partial disability for nonscheduled, nonrelative disabilities, the same factor must neces-

sarily be considered in computing the extent of disability for scheduled injuries.

By sec. 102.44 (2), Stats., the legislature has defined permanent total disability in terms of certain multiple scheduled injuries. Sub. (3) provides a method for computing nonscheduled and nonrelative permanent partial disabilities. However, a nonscheduled, nonrelative disability may, when compared to an injury which renders one totally disabled for industrial purposes, constitute permanent total disability. *See Kohler Co. v. ILHR Department, supra.* Under such circumstances, the disability would qualify as one not specifically enumerated in sub. (2) and would be governed by that section. On the other hand, in the case of scheduled injuries the legislature has already made this comparison. Sec. 102.44 (4), declares that *"Where the permanent disability is covered by the provisions of sections 102.52, 102.53 and 102.55, such sections shall govern; . . ."* (Emphasis added.) Subject to the limitations of sec. 102.44 (4), all other cases of multiple scheduled or relative injuries are to be compensated according to the provisions of sec. 102.53. We conclude no other reasonable interpretation of sec. 102.44 is possible.

In 2 Larson, *Law of Workmen's Compensation,* p. 88.55, sec. 58.20, the author concludes that the field of workmen's compensation law is presently dominated by the view that scheduled allowances should not be deemed exclusive. However, the author acknowledges that it is difficult to speak in terms of a majority rule on the issue, because of the differences in statutory background. Specifically, Larson recognizes that those jurisdictions which hold that scheduled allowances are not to be deemed exclusive, are of no assistance to those jurisdictions where the statutes expressly provide that scheduled payments are exclusive. *See* Larson, *supra,* page 88.69, *fn.* 28. The language used in sec. 102.44 (4), Stats., places Wisconsin in the latter category.

We would observe that those jurisdictions which hold that scheduled allowances are not to be considered exclusive, do so on two rationale. The first is where the injury can be classified as one which extends to the entire body:

"The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive. A common example of this kind of decision is that in which an amputation of a leg causes pain shooting into the rest of the body, general debility, stiffening of the hip socket, or other extended effects resulting in greater interference with ability to work than would be expected from a simple and uncomplicated loss of the leg." Larson, *supra,* pages 88.55–88.61.

This principle was quoted with approval in *Wagner v. Industrial Comm.* (1956), 273 Wis. 553, 566, 79 N. W. 2d 264, 80 N. W. 2d 456, where the employee sustained an occupational disease of the hands. Thus, while this concept might be applied in an appropriate situation, it is inapplicable under the circumstances of the instant case. [1]

The second rationale for holding that scheduled benefits are not exclusive, arises where the statutes provide for both total disability and disability for a specific injury *without expressly providing that either section shall be exclusive.* (Emphasis added.) The Supreme Court of Michigan expressed this view in a case where an equally divided court reversed judicial precedent of long standing. *Van Dorpel v. Haven-Busch Co.* (1957), 350 Mich. 135, 85 N. W. 2d 97. The prevailing opinion defined the sole question of workmen's compensation

---

[1] This conclusion is based upon credible testimony in the record that plaintiff's unemployability is a result of the combined effects of the injury and of her age. A different situation might be presented if the effects of the disability had extended beyond the leg in a physical sense and as a result rendered the plaintiff less employable.

cases to be whether, after the period of indemnification for losses falling short of total disability, the injured employee could return to work. The court then stated at page 145:

"'It could therefore be argued that, since the act must be given a liberal construction,' he continues, 'destruction of the more favorably remedy should not be read into the act by implication in a case where claimant is able to prove a case coming under either heading. . . . To refuse total disability benefits in such a case . . . has the effect of ruling out the inability-to-get-work element in a listed group of injuries which just happen to take the form of a neatly classifiable loss of a member. . . . Logically there is no reason to make the distinction [whether total disability exists] turn on the physical extension of effects beyond the lost member. . . .'" *See* Larson, *supra*, page 88.69.

However, this theory can have no application in this state since the Wisconsin statute has declared when scheduled allowances shall govern.

### *Sufficiency of evidence concerning future medical treatment.*

The record reflects that following the injury and during the lengthy period of treatment certain other medical and physical ailments presented problems. These included amyloidosis, osteomyelitis and osteoporosis.

As we understand these diseases, and in layman's language:

*Amyloidosis* is a secondary blood infection. A common cause being Staphylococcus Aureus infection which appellant developed when readmitted to the hospital for further surgery in July of 1961.

*Osteomyelitis* is an inflammation of the bone marrow. In this instance it occurred in the area of the left hip.

*Osteoporosis* is a loss of calcium content from the bones, which may be caused by prolonged bed rest and inactivity, and is a disease common in elderly people.

As we have previously stated, the accident occurred October 30, 1960, and the department determined further medical care and treatment were not required after July 18, 1966.

Sec. 102.42 (1), Stats., makes provision requiring the employer to supply medical treatment during the healing period. The applicable portion of that section provides:

"102.42 **Incidental compensation.** (1) The employer shall supply such medical, surgical and hospital treatment, medicines, medical and surgical supplies, crutches, artificial members, appliances, and training in the use of artificial members and appliances, or, at the option of the employe, if the employer has not filed notice as hereinafter provided, Christian Science treatment in lieu of medical treatment, medicines and medical supplies, as may be reasonably required to cure and relieve from the effects of the injury, and to attain efficient use of artificial members and appliances, and in case of his neglect or refusal seasonably to do so, or in emergency until it is practicable for the employe to give notice of injury, the employer shall be liable for the reasonable expense incurred by or on behalf of the employe in providing the same. . . ."

In *Knobbe v. Industrial Comm.* (1932), 208 Wis. 185, 189, 190, 242 N. W. 501, the court stated the following definition of the healing period:

"The healing period is understood to mean, and is generally construed by the Industrial Commission as meaning, the period prior to the time when the condition becomes stationary. This requires the postponement of the fixing of the permanent partial disability to the time that it becomes apparent that the leg will get no better or no worse because of the injury. The healing period is expected to be temporary, during it the employee is

submitting to treatment, is convalescing, still suffering from his injury, and unable to work because of the accident. The interval may continue until the employee is restored so far as the permanent character of his injuries will permit."

The healing period is not determined by reference to the percentage of disability but by a determination of whether the process initiated by the injury has been arrested, or has become stationary. *Johnson v. Industrial Comm.* (1961), 14 Wis. 2d 211, 109 N. W. 2d 666.

Although the department found that appellant would require assistance in household chores, it considered such assistance not to constitute further medical care as contemplated by the statute. The department further found that the appellant is in a convalescent home because she had no relatives to live with and it would have been inadvisable for her to live alone. The only question presented is whether there is sufficient credible evidence to sustain these findings.

In *Semons Department Store v. ILHR Department* (1971), 50 Wis. 2d 518, 523, 184 N. W. 2d 871, this court reaffirmed the standard on review in workmen's compensation cases:

" 'The question is not whether there is credible evidence in the record to sustain a finding the commission did not make, but whether there is any credible evidence to sustain the finding the commission did make.' *Unruh v. Industrial Comm.* (1959), 8 Wis. 2d 394, 398, 99 N. W. 2d 182."

In *Worsch v. ILHR Department* (1970), 46 Wis. 2d 504, 512, 513, 175 N. W. 2d 201, this court restated the governing principles where there is a conflict of medical testimony in the record:

" ' "The weight and credibility to be given medical witnesses in a workmen's compensation case are for the Industrial Commission. The rule as stated in *Milwaukee E. R. & T. Co. v. Industrial Comm.* (1951), 258 Wis.

466, 475, 46 N. W. (2d) 198, is: 'It is a well-established rule that the commission's finding on disputed medical testimony is conclusive. *A. D. Thomson & Co. v. Industrial Comm.* (1928), 194 Wis. 600, 602, 217 N. W. 327; *General A. F. & L. Assur. Corp. v. Industrial Comm.* (1937), 223 Wis. 635, 641, 271 N. W. 385; *Crucible Steel Casting Co. v. Industrial Comm., supra* [(1936), 220 Wis. 665, 265 N. W. 665] (p. 669).' See also *Borden Co. v. Industrial Comm., supra; Borum v. Industrial Comm.* (1959), 6 Wis. (2d) 168, 93 N. W. (2d) 860."

" 'This is true even though this court might have ruled differently had it been in the position of the Industrial Commission.' *Carr v. Industrial Comm.* (1964), 25 Wis. 2d 536, 539, 131 N. W. 2d 328."

It is only where the evidence relied upon by the department is incredible as a matter of law that this court will reverse a finding of the department. *Burks v. ILHR Department* (1969), 45 Wis. 2d 1, 172 N. W. 2d 27. Such a case arises where the department has based its findings on possibilities, speculation or conjecture. *Franckowiak v. Industrial Comm.* (1960), 12 Wis. 2d 85, 106 N. W. 2d 51.

An examination of the evidence presented in regard to each of the appellant's conditions as related to the accident supports the findings of the department.

*Amyloidosis.* While the presence of this disease was suspected, the diagnosis was made in terms of possibilities, not probabilities. Therefore, the evidence is insufficient to establish that the appellant actually suffered from this disorder. *See: Unruh v. Industrial Comm., supra; Franckowiak v. Industrial Comm., supra.*

*Osteomyelitis.* The recurrence of this disorder was subject to conflicting medical testimony. One doctor feared a recurrence because historically the disorder, once present, is never completely eradicated. However, he also put the recurrence of this disease in the realm of possibilities. On the other hand, another doctor testified that osteomyelitis could recur, but it was unlikely.

*Osteoporosis.* Insofar as the appellant would require activity to hold in abeyance the advance of this condition, the medical testimony was in complete agreement. However, the testimony was in dispute as to whether or not further physical therapy would be required. On the one hand, one doctor testified that the appellant needed no further medical care, treatment, or physical therapy. Another doctor testified that the appellant is confined to a wheelchair and needs physical therapy assistance. However, it appears that the appellant is able to walk with the aid of crutches. This doctor also stated that the appellant could do exercises by herself to strengthen her leg muscles. It further appears that the future medical problems contemplated by the doctor related to the problems connected with advancing osteoporosis in the event the appellant was inactive.

*Convalescent care.* A doctor testified that although appellant required a certain amount of domestic help, she did not require nursing care or the type of care normally associated with a convalescent home. This opinion was disputed by two other doctors. The department was entitled to accept the one doctor's testimony. Custodial care, as distinguished from nursing services, has been held not to constitute a compensable element of further medical care under a statute similar to that of sec. 102.42, Stats. In 2 Larson, *supra,* p. 88.255, sec. 61.13, it is stated:

"While 'attendance' in the nursing sense is covered, as the cases just discussed indicate, a line has been drawn between nursing attendance and services that are in essence housekeeping. Rhode Island's statute provides for 'such reasonable . . . attendance . . . as is necessary in order to cure, rehabilitate or relieve the employee from the effects of his injury.' Claimant, whose loss of use of both hands made it impossible to do many ordinary household chores, was held by the Rhode Island court not entitled to be provided with the assistance of a worker in the home whose duties would admittedly be those of

'a combination housekeeper and personal maid.' The court said that the term 'relieve' must, in view of the heading and context of the section, be construed to refer only to relief that is medical in character. The evidence showed that the services contemplated were not such as would be required of either a registered or practical nurse."

*Mental injury.* Appellant contends that the examiner erred in limiting the testimony of one doctor to a physical evaluation, in disregard of the mental, emotional and psychological condition of the plaintiff. In *Johnson v. Industrial Comm.* (1958), 5 Wis. 2d 584, 93 N. W. 2d 439, the court reversed a finding of the industrial commission that did not consider mental injury in determining the healing period where there was credible and undisputed testimony that the functional disorder would probably improve with psychiatric treatment. The court recognized traumatic neurosis as an item of incidental compensation, admonishing however, that such claims should be examined with caution. There the testimony was presented by two psychiatrists.

In the instant case, an objection was made when the doctor, an internist, testified as to the appellant's attitude and mental outlook during the recovery process. In sustaining the objection, the examiner stated: "The improvement should be limited to the physical improvement from an internist's standpoint. I don't think that [the doctor] is qualified to testify from a psychiatric or mental standpoint; maybe you are, Doctor." The doctor presented no qualifications. Furthermore, an examination of his medical report does not establish that the plaintiff suffered any type of neurosis that could be cured by psychiatric therapy. *See Gallagher v. Industrial Comm.* (1960), 9 Wis. 2d 361, 101 N. W. 2d 72.

*By the Court.*—Judgments affirmed.