Colecta MIRELES, Plaintiff-Respondent-Petitioner,

v.

LABOR & INDUSTRY REVIEW COMMISSION, Defendant,

AMETEK-LAMB ELECTRIC and National Union Fire Insurance of Pittsburgh, Defendants-Appellants.

Supreme Court

*No. 98–1607. Oral argument January 6, 2000.—Decided July 12, 2000.*

2000 WI 96

(Also reported in 613 N.W.2d 875.)

For the plaintiff-respondent-petitioner, there were briefs by *John A. Becker* and *Becker, French & DeMatthew*, Racine, and oral argument by *John A. Becker*.

For the defendants-appellants, there was a brief by *Douglas M. Feldman, Oyvind Winstrom,* and *Lindner & Marsack, S.C.*, Milwaukee, and oral argument by *Douglas M. Feldman*.

¶ 1. DAVID T. PROSSER, J. Colecta Mireles (Mireles) seeks review of a published decision of the court of appeals, *Mireles v. LIRC*, 226 Wis. 2d 53, 593 N.W.2d 859 (1999), reversing the judgment of the Circuit Court of Racine County, Wayne J. Marik, Judge. Mireles suffered an "unscheduled" back injury while working for Ametek-Lamb Electric (Ametek) of Racine. She eventually returned to work and subsequently suffered a "scheduled" wrist injury that precluded her from continuing employment at Ametek. Both an Administrative Law Judge (ALJ) and the Wisconsin Labor and Industry Review Commission (LIRC) denied Mireles's claim for additional Worker's Compensation benefits. The circuit court set aside LIRC's decision,

but the court of appeals reversed. We accepted Mireles's petition for review.

¶ 2. Two issues are presented: First, can an injured worker apply for a reopening of an unscheduled injury award under Wis. Stat. § 102.44(6)(b)[1] when a later scheduled injury causes the end of an employment relationship? Second, can an injured worker qualify for permanent total disability benefits pursuant to Wis. Stat. § 102.44(2) based upon a combination of scheduled and unscheduled injuries?

¶ 3. We conclude, first, that Wis. Stat. § 102.44(6)(b) allows the appropriate agency[2] to reopen a Worker's Compensation award to account for loss of earning capacity from an unscheduled injury, even if a scheduled injury causes the termination of an employment relationship.

¶ 4. We conclude, second, that Wis. Stat. § 102.44(2) permits the agency to find permanent total disability based upon a combination of a worker's scheduled and unscheduled injuries. Read together

---

[1] Wisconsin Stat. § 102.03(4) dictates that the right to compensation "shall in all cases be determined in accordance with the provisions of law in effect as of the date of the injury." Thus, when we discuss Mireles's claim for a reopening under Wis. Stat. § 102.44(6)(b), all references to Wisconsin statutes are to the 1991–92 volumes. When we address Mireles's claim for permanent total disability under Wis. Stat. § 102.44(2), all references are to the 1993–94 volumes. Nonetheless, the pertinent statutory provisions have remained unchanged since Mireles's first injury.

[2] At the time Mireles applied for benefits, the Department of Industry, Labor and Human Relations (DILHR) administered the Worker's Compensation Act (the Act). Currently the Act is administered by the Worker's Compensation Division of the Department of Workforce Development (DWD). *See* 1995 Wis. Act 289, § 275, 1995 Wis. Act 27, §§ 9130(4), 9430(5).

with other statutes, Wis. Stat. §§ 102.44(2) and 102.44(4) specifically allow a scheduled injury to be considered as part of a permanent total disability. When a scheduled injury is part of a permanent total disability that includes an unscheduled injury, the disability is not covered by Wis. Stat. §§ 102.52, 102.53, or 102.55. Rather, it is covered by § 102.44(2).

¶ 5. Accordingly, we reverse the decision of the court of appeals and remand this case to LIRC for additional factual determinations so that LIRC may process Mireles's application under the legal standards we outline today.

## THE WORKER'S COMPENSATION ACT

¶ 6. Worker's Compensation benefits in Wisconsin are governed primarily by the Worker's Compensation Act (the Act), which is administered by the Department of Workforce Development (DWD). The Act appears in Chapter 102 of the Wisconsin Statutes. It establishes a complex formula for determining Worker's Compensation benefits. Before we address Mireles's claims, we review the general structure of the Act to aid in reviewing Mireles's situation.

¶ 7. The Act is designed to compensate workers injured in the course of their employment. *State v. LIRC*, 136 Wis. 2d 281, 288, 401 N.W.2d 585 (1987). Benefits payable under the Act fall under one of two categories, temporary disability benefits or permanent disability benefits.

¶ 8. Temporary disability benefits are payable during an injured worker's healing period. Wis. Stat. § 102.43; John D. Neal and Joseph Danas, Jr., *Worker's Compensation Handbook* § 5.3 (4th ed. 1997). By contrast, permanent disability benefits compensate an injured worker when a disability remains after the

healing period. Wis. Stat. § 102.44; *Worker's Compensation Handbook* § 5.15. The focus of Mireles's appeal is LIRC's refusal to award *permanent* disability benefits.

¶ 9. Permanent disability benefits are divided into two distinct categories: compensation for "scheduled" injuries and compensation for "unscheduled" injuries. *Worker's Compensation Handbook* § 5.18. Scheduled injuries are enumerated in Wis. Stat. § 102.52. Scheduled injuries require the payment of benefits for a specific number of weeks, as outlined in the statute. For example, § 102.52(1) mandates an award of 500 weeks of benefits for the loss of an arm at the shoulder.[3] Wisconsin Stat. § 102.53 mandates increases of awards for certain combinations of permanent disabilities.

¶ 10. The schedules contained in Wis. Stat. § 102.52 presume that a worker has lost a body part entirely. As noted, § 102.52(1) awards 500 weeks of benefits for the "loss of an arm at the shoulder." If a worker suffers a lesser injury, such as a major loss of motion of the arm at the shoulder, the worker is com-

---

[3] For both temporary and permanent disability benefits, the Act uses a figure representing two-thirds of the injured worker's average earnings as a basis for calculating benefits, Wis. Stat. §§ 102.43, 102.44, and 102.52, subject to calculation methods and minimum and maximum statutory levels of compensation. Wis. Stat. § 102.11; John D. Neal and Joseph Danas, Jr., *Worker's Compensation Handbook* §§ 5.4 and 5.15 (4th ed. 1997). The Act individualizes compensation by awarding benefits at a two-thirds earnings rate for a certain number of weeks, depending on how the injury is classified within the Act. Wis. Stat. §§ 102.43, 102.44, and 102.52; *Worker's Compensation Handbook* §§ 5.4 and 5.15. For permanent partial disability benefits, however, the maximum benefits are set low enough by statute that most injured workers receive the maximum benefits allowable. *Worker's Compensation Handbook* § 5.15.

pensated based on how the injury compares to total loss of the arm. Wis. Stat. § 102.55(3). Thus, if a worker suffers a loss of motion of the arm deemed to be a 50 percent loss by DWD, the worker will receive 50 percent of the scheduled period of benefits, or 250 weeks.

¶ 11. Scheduled injury benefits are presumed to include compensation for an injured worker's loss of earning capacity. *Mednicoff v. ILHR*, 54 Wis. 2d 7, 14, 194 N.W.2d 670 (1972).

¶ 12. Mireles suffered scheduled injuries to her wrists. She received compensation for permanent partial disability for the damage to her right wrist. Mireles's right wrist injury was assessed to be a three percent permanent disability, and her scheduled award was limited by that determination pursuant to Wis. Stat. § 102.55(3).

¶ 13. Many injuries are not included in the statutory schedules. *Worker's Compensation Handbook* § 5.20. These "unscheduled" injuries, which are primarily injuries to the torso and head, as well as mental injuries, usually require more individualized evaluation than scheduled injuries. *See Worker's Compensation Handbook* § 5.15. Mireles suffered a back injury. Back injuries are unscheduled injuries.

¶ 14. Permanent total disability based upon an unscheduled injury or injuries results in lifetime benefits. Wis. Stat. § 102.44(2). Permanent partial disability from an unscheduled injury or injuries results in benefits payable for a portion of 1,000 weeks, depending upon how the injury compares "to one causing permanent total disability." Wis. Stat. § 102.44(3). For example, if a back injury causes a 20 percent permanent partial disability for a worker, the worker is eligible for 200 weeks of benefits, or 20 percent of 1,000 weeks. *See Worker's Compensation Handbook* § 5.33.

¶ 15. The calculation to determine permanent partial disability is based upon a medical comparison "with injuries that would render a person permanently totally disabled for industrial purposes. . .and *not* to injuries that would totally disable a person functionally without regard to loss of earning capacity." *Mednicoff*, 54 Wis. 2d at 11 (quoting *Kurschner v. ILHR*, 40 Wis. 2d 10, 18, 161 N.W.2d 213 (1968)). Such a calculation attempts to measure an injured worker's loss of earning capacity, not simply the physical effects of an injury.[4]

¶ 16. A permanent partial disability that is not scheduled does not always result in compensation for loss of earning capacity. If the employee returns to work, the employee receives compensation for loss of earning capacity if the employee suffers a 15 percent or more wage decrease. Wis. Stat. § 102.44(6)(a)–(b). Otherwise, an employee receives compensation only for "the physical limitations resulting from the injury." *Id.*

---

[4] Compensation for loss of earning capacity accounts for:

the effect of the injured [employee's] permanent physical and mental limitations resulting from the injury upon present and potential earnings in view of the following factors:
- (a) Age;
- (b) Education;
- (c) Training;
- (d) Previous work experience;
- (e) Previous earnings;
- (f) Present occupation and earnings;
- (g) Likelihood of future suitable occupational change;
- (h) Efforts to obtain suitable employment;
- (i) Willingness to make reasonable change in a residence to secure suitable employment;
- (j) Success of and willingness to participate in reasonable physical and vocational rehabilitation program; and
- (k) Other pertinent evidence.

Wis. Admin. Code § DWD 80.34 (Nov. 1998).

Whether or not an employee suffers a 15 percent or more wage decrease, an employee still can receive compensation for loss of earning capacity if the employer terminates the employment relationship for any reason, or the employee terminates the relationship because of physical or mental limitations. Wis. Stat. § 102.44(6)(b).

¶ 17. Mireles presents two claims for benefits in this case. Both claims are affected by the fact that Mireles suffered an unscheduled injury followed by a scheduled injury while she worked in a production job at Ametek.

## FACTS

¶ 18. Mireles worked for Ametek from 1988 to 1993. On April 22, 1991, she injured her back at Ametek while hurriedly packing five-pound motors into boxes. Mireles lifted a box containing four motors and "she felt a snap [of] pain in her back." Mireles could not work for some months afterward and received temporary total disability benefits from April 22, 1991, until November 25, 1991. While she recovered, she underwent therapy and received injections. At the time of her injury, Mireles earned $346 per week.

¶ 19. She returned to work in the same department, but in June 1992 another back episode rendered her unable to work. Mireles reinjured her back when a lift truck bumped a table at which she was sitting, and she was forced to jump to avoid being pinned between a pole and the table. Ametek initially refused to compensate her for temporary total disability or permanent partial disability. The parties, however, entered into a compromise agreement in September 1992 covering claims through the date of the agreement.

¶ 20. After the June 1992 back episode, Mireles's doctor put her on maximum lifting restrictions of 30 to 35 pounds. Mireles returned to a light duty job at Ametek in which she put tape on wires for motors. The repetitive hand movements of this task caused Mireles to develop carpal tunnel syndrome. The carpal tunnel syndrome incapacitated both of her wrists. As a result, she could no longer work, and on October 18, 1993, her right wrist injury was handled as a separate work injury. She received temporary total disability compensation from November 26, 1993, until October 15, 1994.

¶ 21. Mireles had surgery to correct the carpal tunnel syndrome in her right wrist. She did not have surgery on her left wrist because surgery was not successful on her right wrist. The doctor who treated her wrists assessed her permanent partial disability at three percent loss of use for her right hand and Mireles was compensated for this loss.[5] The same doctor placed permanent restrictions on Mireles that limited her lifting with her right hand to two pounds and precluded her from repetitive hand movements of any kind with either hand.

¶ 22. Ametek concluded that it had no work available for Mireles within these restrictions. The employment relationship between Ametek and Mireles ended after Mireles's sick leave exceeded one year.

¶ 23. At a hearing in 1996, Mireles testified that the problems with her hands and back affect her daily. She indicated that the surgery on her right hand did not eliminate occasional sharp pain and also did not reestablish strength in her right hand. In addition,

---

[5] At oral argument this court asked Mireles's counsel how much money Mireles had received for the permanent damage caused by the carpal tunnel syndrome. Counsel indicated that she had received about $1,500 for her loss.

Mireles testified that her back still bothers her. She stated that the pain in her back sometimes necessitates that she take twelve pain pills per day. She still wears a back brace daily.

## PROCEDURAL HISTORY

¶ 24. On March 29, 1995, Mireles filed an application with the Department of Industry, Labor and Human Relations (DILHR)[6] to reopen the award for her unscheduled back injury. She claimed that she deserved payment for 50 to 100 percent loss of earning capacity for her back injury. The ALJ dismissed her claim. The ALJ determined that Wis. Stat. § 102.44(6)(b), which allows DWD to reopen an unscheduled injury award for three different reasons,[7] would not permit Mireles to obtain a reopening of the previous award for her unscheduled back injury. In addition, the ALJ concluded that Mireles was not eligible for either a loss of earning capacity award or permanent total disability benefits based upon a combination of scheduled and unscheduled injuries.

¶ 25. In addressing Mireles's first argument, the ALJ dismissed her application because her situation satisfied none of the three conditions in Wis. Stat. § 102.44(6)(b). First, according to the ALJ's findings, Mireles did not receive a 15 percent or more wage

---

[6] As noted above, DIHLR administered the Act before DWD was created in 1995.

[7] Wisconsin Stat. § 102.44(6)(b) allows DWD to reopen an award for an unscheduled injury if, after returning to work, any of the following circumstances occur: (1) the employer terminates the employment relationship; or (2) the employee terminates the employment relationship because of physical or mental limitations; or (3) the employee suffers a wage loss of 15 percent or more.

reduction in her light duty position at Ametek. Second, the ALJ indicated that Mireles did not satisfy either of the other two conditions in the statute because § 102.44(6)(b) "mentions restrictions, but these are intended to be from the same work injury, not a later scheduled, work injury."

¶ 26. LIRC agreed with the ALJ's decision, and it adopted the findings and order as its own. LIRC also issued its own memorandum opinion, finding that under Wis. Stat. § 102.44(6)(b), "if the employment is terminated by the employer or the employe because his or her physical or mental limitations prevent him or her from continuing such employment then loss of earning capacity must be taken into account." Nonetheless, LIRC agreed with the ALJ "that although this section of law mentions restrictions, these are intended to be from the same work injury not a later scheduled injury." LIRC concurred with the ALJ's finding that Mireles "could have continued to work within her restrictions due to her unscheduled back injury" had she not had the severe restrictions on the use of her hands. Accordingly, LIRC affirmed the ALJ's dismissal of Mireles's application because LIRC did not find "that the applicant was terminated due to her unscheduled injury." Rather, Ametek terminated Mireles because of the restrictions for her scheduled injury, a situation not covered under § 102.44(6)(b).

¶ 27. LIRC also addressed Mireles's claim under Wis. Stat. § 102.44(2), in which she alleged that she "suffered permanent total disability based on both the unscheduled and scheduled restrictions."[8] Mireles

---

[8] Neither the ALJ's or LIRC's memorandum opinion addressed Mireles's arguments by explicitly applying Wis. Stat. § 102.44(2). Both opinions, however, did address Mireles's general argument as to the combination of her injuries, a claim that

argued that her earlier back injury caused her later acquired carpal tunnel syndrome because she never would have worked in a position requiring repetitive hand movement without her back injury restrictions. LIRC dismissed her argument, concluding that she had not established a causal link between her back injury and her carpal tunnel syndrome.

¶ 28. The circuit court set aside LIRC's decision on the basis that the agency erroneously interpreted Wis. Stat. § 102.44(6)(b). The court of appeals reversed, addressing both of Mireles's Worker's Compensation claims. The court of appeals applied great weight deference review to LIRC's decision.

## STATUTORY INTERPRETATION

¶ 29. This case presents a question of statutory interpretation. The goal of statutory interpretation is to ascertain the intent of the legislature. *Doe v. American Nat'l Red Cross*, 176 Wis. 2d 610, 616, 500 N.W.2d 264 (1993). The first step of our interpretation process is to look at the language of the statute. *Kelley Co. v. Marquardt*, 172 Wis. 2d 234, 247, 493 N.W.2d 68 (1992). If the language of the statute clearly indicates the legislative intent, it is our duty to apply that intent and not look beyond the statutory language. *Id.* at 247. Although "it is true that statutory interpretation begins with the language of the statute, it is also well established that courts must not look at a single, iso-

is before this court under Wis. Stat. § 102.44(2). That statutory section is the governing section for claims of permanent total disability. LIRC's opinion specifically recognized that "[i]n addition" to her claim for permanent partial disability, Mireles also claimed she "suffered permanent total disability based on both the unscheduled and scheduled restrictions."

lated sentence or portion of a sentence, but at the role of the relevant language in the entire statute." *Alberte v. Anew Health Care Serv.*, 2000 WI 7, ¶ 10, 232 Wis. 2d 587, 605 N.W.2d 515 (*citing Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51 (1987)).

¶ 30. If the legislature has directed an agency to administer a statute, we consider the interpretation of the agency under certain circumstances, *State ex rel. Parker v. Sullivan*, 184 Wis. 2d 668, 699, 517 N.W.2d 449 (1994).

## PERMANENT PARTIAL DISABILITY CLAIM

¶ 31. The first issue concerns the operation of Wis. Stat. § 102.44(6)(b). Mireles contends that she qualifies for a reopening of her unscheduled injury award under all three clauses of § 102.44(6)(b). Under this claim, Mireles seeks compensation for loss of earning capacity caused by her back injury. Ametek contends that Mireles does not qualify under the statute. In particular, Ametek maintains that Mireles does not qualify under the second clause of § 102.44(6)(b) because the physical limitations that precluded her from working for Ametek were scheduled limitations, not unscheduled limitations. Stated simply, Mireles was forced to leave her position because of her wrists, not her back.

¶ 32. This case warrants due weight deference to the interpretation of the administrative agency. LIRC has had experience interpreting the statute, but its interpretations have been inconsistent.[9] Due weight

---

[9] Previously, LIRC has concluded that the physical limitations causing the end of the employment relationship need not form the basis for a claim of benefits under Wis. Stat. § 102.44(6)(b). *See Althaus v. Wingra Stone Co.*, No. 8504455

deference is the "appropriate deference." *Brauneis v. LIRC*, 2000 WI 69, ¶ 19, 236 Wis. 2d 27, 612 N.W.2d 635. We stated in *Brauneis* that when an agency's statutory interpretation is accorded due weight, the agency's interpretation is not conclusive. *Id.* If a court finds an alternative interpretation more reasonable, it need not adopt the agency's interpretation. Here the court concludes that its alternative interpretation is not only more reasonable than LIRC's but also better fulfills the intent of the statute.

¶ 33. Wisconsin Stat. § 102.44(6)(b) sets forth three situations in which DWD may reopen an unscheduled injury award. Wisconsin Stat. § 102.44(6)(b) provides:

> (6)(b) If, during the period set forth in s. 102.17(4) the employment relationship is terminated by the employer at the time of the injury, or by the employe because his or her physical or mental limitations prevent his or her continuing in such employment, or if during such period a wage loss of 15% or more occurs the department may reopen any award and make a redetermination taking into account loss of earning capacity.

¶ 34. Subsection (6)(b) requires some explanation in order to address the issues in this case. First,

(LIRC December 22, 1998) (ruling that, for the purposes of Wis. Stat. § 102.44(6)(b), an unscheduled physical injury is eligible for an accounting for loss of earning capacity even though the injured worker quit because of *another* unscheduled injury); *Armstrong v. Heyde Health Sys., Inc.*, No. 92034936 (LIRC May 26, 1998) (explaining that "Wis. Stat. § 102.44(6)(b) does not require that the physical limitations causing loss of employment be attributable to a Chapter 102 injury").

the statute refers to a period set forth in Wis. Stat. § 102.17(4).[10] This period is a 12-year period beginning at the date of injury. This section is a statute of limitations. Second, the statute uses the phrase "the employer at the time of injury" in the first clause. Wis. Stat. § 102.44(6)(b). The phrase "at the time of the injury" modifies the employer, not the termination. Thus, the statute can be understood to read: If, during the period set forth in § 102.17(4) the employment relationship is terminated by the employer for whom the employee worked at the time the employee was injured. . .the department may reopen any award and make a determination taking into account loss of earning capacity. Wis. Stat. § 102.44(6)(b). If the phrase "at the time of the·injury" modified the words "is terminated," the statute of limitations would be rendered inoperative. When interpreting statutes we give effect to every word in the statute so that no part of the statute is rendered superfluous. *Lake City Corp. v. City of Mequon*, 207 Wis. 2d 155, 162, 558 N.W.2d 100 (1997).

¶ 35. Under Wis. Stat. § 102.44(6)(b), an applicant may seek to revisit a previous award if the employer at the time of the injury terminates the employment relationship. No reason for the termination is required. By contrast, the second clause in the statute, in which the employee terminates the relationship, allows an employee to reopen *only* if physical or

---

[10] Wisconsin Stat. § 102.17(4) states:

The right of an employe, the employe's legal representative or dependent to proceed under this section shall not extend beyond 12 years from the date of the injury or death or from the date that compensation, other than treatment or burial expenses, was last paid, or would have been last payable if no advancement were made.

mental limitations caused the employee to end the employment relationship. Had the legislature intended to place any qualifications on employer terminations, it would have created such qualifications. Thus, if an employer terminates its relationship with an employee by closing its plant or laying off workers, a previously injured employee may apply for a reopening under § 102.44(6)(b). If Ametek terminated the employment relationship with Mireles, the first clause of the statute would allow Mireles to apply for a reopening of the unscheduled injury award.

■

¶ 36. Mireles and Ametek disagree about which party terminated the employment relationship in this case. In factual disputes LIRC's findings are conclusive as long as they are supported by credible and substantial evidence. Wis. Stat. § 102.23(6); *Ide v. LIRC*, 224 Wis. 2d 159, 165, 589 N.W.2d 363 (1999). Moreover, we have a duty to search the record to find credible evidence that supports the agency's findings. *Brakebush Bros. v. LIRC*, 210 Wis. 2d 623, 630, 563 N.W.2d 512 (1997).

¶ 37. The record in this case is ambiguous about which party terminated the relationship. The ALJ made findings of fact in his memorandum opinion, and LIRC adopted those findings as its own and issued its own memorandum opinion. Both opinions describe the end of the employment relationship in a confusing manner. The ALJ first wrote that Mireles "was terminated" by Ametek, but he later stated that Mireles "was required to leave her job at respondent." In the introduction to the opinion, the ALJ wrote that Mireles's application "allege[d] that the applicant had to leave her employment."

¶ 38. In its memorandum opinion, LIRC mentioned several times that Mireles "was terminated." But LIRC also wrote that "the evidence indicates that the applicant subsequently terminated her employment."

¶ 39. We conclude, therefore, that the present record is insufficient to classify Mireles's application under the first clause of Wis. Stat. § 102.44(6)(b). The factual findings of LIRC were not developed adequately because of the position taken by the agency. On remand to LIRC, it will be necessary to make a factual finding whether Mireles qualifies under this portion of the statute.

¶ 40. The parties also focused on the second clause of Wis. Stat. § 102.44(6)(b). The issue here is whether the "physical limitations" mentioned in the statute must derive from an unscheduled injury. This part of the statute allows DWD to reopen an unscheduled injury award if the employee terminates the employment relationship "because his or her physical or mental limitations prevent his or her continuing in such employment." Wis. Stat. § 102.44(6)(b).

¶ 41. We conclude that the second clause of Wis. Stat. § 102.44(6)(b) does not require that the limitations that cause the employee to end the relationship arise from an unscheduled injury. Had the legislature wished to make such a requirement, it could have written:

> If, during the period set forth in s. 102.17(4) the employment relationship is terminated. . .by the employe because his or her physical or mental limitations *resulting from the injury* prevent his or her continuing in such employment.

The legislature did not draft the statute in that manner. To give effect to the reading favored by Ametek would breach our duty to interpret statutes by their ordinary language whenever possible. Moreover, we see nothing in Wis. Stat. § 102.44 to indicate that scheduled injuries cannot trigger the second clause of § 102.44(6)(b). In particular, we note that the legislature wrote § 102.44(6)(a) using the exact phrase "resulting from the injury" added to the hypothetical statute above.[11]

¶ 42. Ametek argues that in cases of permanent partial disability from scheduled injuries, the schedule is exclusive. Such exclusivity, however, applies to the award of benefits, *see Vande Zande v. DILHR*, 70 Wis. 2d 1086, 1093, 236 N.W.2d (1975); *Mednicoff*, 54 Wis. 2d at 14, not to the reasons for termination under Wis. Stat. § 102.44(6)(b). Mireles is not asking for disability benefits for an injury covered by any of the statutory schedules. Her claim is for benefits based on an unscheduled injury. The reason for the end of the relationship, therefore, is irrelevant, as long as the termination under the second clause in the statute was caused by physical or mental limitations and not some other factor.

■

¶ 43. Ametek argues that every scheduled injury that follows an unscheduled injury will give rise to a

---

[11] Wisconsin Stat. § 102.44(6)(a) states:

Where an injured employe claiming compensation for disability under sub. (2) or (3) has returned to work for the employer for whom he or she worked at the time of the injury, the permanent disability award shall be based upon the physical limitations *resulting from the injury* without regard to loss of earning capacity unless the actual wage loss in comparison with earnings at the time of injury equals or exceeds 15% (emphasis added).

claim for loss of earning capacity. This is true, however, only when one of the three situations envisioned by Wis. Stat. § 102.44(6)(b) actually occurs. We conclude that the statute allows a claim for loss of earning capacity in such a factual situation. Such an interpretation is not only clear from the language of the statute but also consistent with the purpose of the Act. An injured worker in Mireles's predicament faces the task of finding work in the general labor market upon termination of the employment relationship. Mireles, therefore, should not be penalized for having suffered a scheduled injury that in turn caused the end of her employment.

¶ 44. LIRC's and Ametek's interpretation of the second clause of Wis. Stat. § 102.44(6)(b) does not conform with the language of the statute. Here again, however, the factual record is insufficient to classify Mireles's application within the second clause of § 102.44(6)(b). On remand to LIRC, it will be necessary to make a factual finding whether Mireles qualifies under this portion of the statute.

¶ 45. The parties also dispute whether the third clause in Wis. Stat. § 102.44(6)(b) applies to Mireles's application. That clause allows DWD to reopen an award if an employee suffers a wage loss of 15 percent or more. The clause does not mention any other requirements other than the wage loss. When considering § 102.44(6) as a whole, we conclude that Mireles does not qualify under this portion of the statute.

¶ 46. Wisconsin Stat. § 102.44(6)(a) governs situations in which an employee who suffers an unscheduled injury returns to work for the "employer for whom he or she worked at the time of the injury." In that part of the statute, an employee cannot recover for loss of earning capacity unless the unscheduled injury causes a wage loss of 15 percent or more. *Id.* Like

§ 102.44(6)(a), the first two clauses of § 102.44(6)(b) apply only to the employer for whom the injured party worked when the injury occurred. Reading § 102.44(6) as a whole, we conclude that the last clause of § 102.44(6)(b) operates only when the employee continues to work for the employer at the time of the injury and suffers a wage loss of 15 percent or more. The last clause of § 102.44(6)(b), therefore, refers to the situation mentioned in § 102.44(6)(a), namely a wage reduction of 15 percent or more at the employer for whom the employee worked at the time of injury.

¶ 47. If the wage loss provision of Wis. Stat. § 102.44(6)(b) were to operate after the end of the employment relationship, the first two provisions of § 102.44(6)(b) would be superfluous. An injured worker always could qualify for a reopening because any time the employment relationship ended, the employee would have suffered a wage loss of 15 percent or more. Mireles does not qualify under this portion of the statute because the employment relationship ended before she experienced a 15 percent wage loss.

¶ 48. LIRC's memorandum opinion contends that public policy concerns caution against our holding today. LIRC agreed with the ALJ's statement that "it would be a great disincentive for employers to rehire anyone with a non-scheduled injury as a later, minor, scheduled injury could cause unanticipated greater liability. It could be cheaper to pay the penalty to rehire than face the greater liability." Five factors caution against LIRC's interpretation.

¶ 49. First, the language of the statute allows an applicant to claim he or she deserves a reopening of an award even if an unscheduled injury is followed by a scheduled injury, and the scheduled injury causes the end of the employment relationship. If employers

choose to face penalties rather than rehire workers in Mireles's situation, it will become the responsibility of the legislature and the designated agency to design incentives to serve the overall purpose of the Act.

¶ 50. Second, in many cases employers will have a strong incentive to rehire workers with unscheduled injuries. When an employer accommodates an injured worker with work within restrictions, the employer gains the work of the employee, as opposed merely to paying disability benefits to a non-worker. After all, had Ametek refused to rehire Mireles, she could have brought a claim for permanent partial disability benefits for her back injury. Thus, Ametek faced no greater liability for Mireles's unscheduled injury after her scheduled injury than it would have confronted had it refused to rehire her initially. In addition, the employer would avoid penalties by rehiring such a worker.

¶ 51. Third, even under our holding today, DWD and LIRC still maintain discretion to deny applications made under Wis. Stat. § 102.44(6)(b). The legislature wrote this section in a way that gives the agency administering the law the option of fashioning policies.

¶ 52. Fourth, the ALJ, LIRC, and Ametek have expressed concerns about a breakdown in the exclusiveness of scheduled benefits. However, any additional compensation awarded to Mireles would account only for that portion of her disability caused by the unscheduled injury. Any award would be subject to the apportionment guidelines in cases of permanent partial disability. *See Vande Zande*, 70 Wis. 2d at 1093; *Langhus v. LIRC*, 206 Wis. 2d 494, 505, 557 N.W.2d 450 (Ct. App. 1996).

¶ 53. Finally, we find it likely that the legislature intended that an injured worker such as Mireles

would receive compensation for her unscheduled injury. In numerous instances, the Act provides compensation for cases of multiple injuries. *See* Wis. Stat. §§ 102.44(2), 102.53, 102.54. When the legislature enacted § 102.44(6)(b), it must have contemplated the occurrence of a situation like the one here. Otherwise, it could have written subsection (6)(b) the same as subsection (6)(a), which explicitly applies to "the physical limitations *resulting from the injury*." The legislative intent evinces a concern about an injured worker's ability to find suitable employment after injury and a subsequent change in the employment relationship. *See* Wis. Admin. Code § DWD 80.34 (July, 1996) (considering "[l]ikelihood of future suitable occupational change" in evaluating loss of earning capacity).

## PERMANENT TOTAL DISABILITY CLAIM

¶ 54. The second issue concerns the interpretation of Wis. Stat. § 102.44(2). This statute grants lifetime benefits to workers who are totally and permanently disabled. Mireles seeks benefits under § 102.44(2) based upon a combination of scheduled and unscheduled injuries. Ametek argues that an unscheduled injury may not be combined with a scheduled injury under this section because scheduled injuries are covered exclusively under three other sections of the Act.

¶ 55. As with the first issue, we conclude that we give LIRC's interpretation only due weight. The plain language of Wis. Stat. § 102.44(2), when considered in concert with all of § 102.44 and other statutes referred to in the text of § 102.44, dictates that Mireles may qualify for total permanent disability benefits. Furthermore, LIRC's memorandum opinion did not

develop significant reasoning about this claim[12] and LIRC took a contrary position in another case, *Langhus*, 206 Wis. 2d 494.

¶ 56. Wisconsin Stat. § 102.44(2) must be read in context. Wisconsin Stat. § 102.43, titled "Weekly Compensation Schedule," sets forth instructions about the payment of benefits. The section covers total, partial, temporary, and permanent disabilities.

¶ 57. Wisconsin Stat. § 102.44 modifies the immediately preceding section with limitations. Subsection (2) of § 102.44 provides:

> In case of permanent total disability aggregate indemnity shall be weekly indemnity for the period that the employe may live. Total impairment for industrial use of both eyes, or the loss of both arms at or near the shoulder, or of both legs at or near the hip, or of one arm at the shoulder and one leg at the hip, constitutes permanent total disability. This enumeration is not exclusive, but in other cases the department shall find the facts.

¶ 58. Subsection (2) governs the permanent total disability indemnity. The subsection lists several combinations of scheduled injuries that constitute permanent total disability. The text concludes: "This enumeration is not exclusive, but in other cases the department shall find the facts." Wis. Stat. § 102.44(2).

---

[12] LIRC's memorandum opinion focused on the argument by Mireles that her back injury caused her wrist injury because she never would have worked in the position that caused her wrist injury "but for" her back injury. *See Mireles v. Ametek Lamb Electric*, No. 91027213 at 4–5 (LIRC April 25, 1997). Thus, LIRC did not address Mireles's claim in accord with its position in *Langhus v. LIRC*, 206 Wis. 2d 494, 505, 557 N.W.2d 450 (Ct. App. 1996).

¶ 59. The question we must decide is whether the "other cases" of permanent total disability may include a combination of scheduled and unscheduled injuries. Ametek contends that the combination of scheduled and unscheduled injuries suffered by Mireles may not give rise to a claim under Wis. Stat. § 102.44(2). Ametek bases its position on *Langhus*, 206 Wis. 2d at 505–06, which discussed the exclusionary reach of Wis. Stat. § 102.44(4). Section 102.44(4) states that "[w]here the permanent disability is covered by ss. 102.52, 102.53, and 102.55, such sections shall govern."

¶ 60. Wisconsin Stat. §§ 102.52, 102.53, and 102.55 must be examined in turn. Section 102.52 is the "Permanent partial disability schedule."[13] This schedule contains the full list of scheduled injuries. Mireles's claim for permanent total disability is not covered by § 102.52 because one of her injuries—her back injury—is not part of the schedule.

¶ 61. Section 102.53 relates to "Multiple injury variations." Its introductory clause begins: "In case an injury causes more than one permanent disability specified in ss. 102.44(3), 102.52, and 102.55." Referenced sections 102.52 and 102.55 deal exclusively with scheduled injuries and combinations of scheduled injuries. Section 102.44(3) pertains to "permanent partial disa-

---

[13] The title of Wis. Stat. § 102.52 supports our reading of the Act. "Although the title is not part of the statute it may be persuasive of the interpretation to be given the statute." *Pure Milk Prods. Coop. v. National Farmers Org.*, 64 Wis. 2d 241, 253, 219 N.W.2d 564 (1974). The title of a statute cannot defeat the language of the law, but it is persuasive evidence of a statutory interpretation. *Id.* Section 102.52 is titled "Permanent *partial* disability schedule" (emphasis added). The title, therefore, further evinces the legislature's intent that § 102.52 applies only in cases of permanent partial disability.

bility." Because Mireles's claim is for permanent total disability, not permanent partial disability, Wis. Stat. § 102.44(3) does not apply. Mireles's claim for permanent total disability is not covered by § 102.53.

¶ 62. Section 102.55, "Application of schedules," refers back to § 102.52 and speaks to injuries "specified in this schedule." Thus, § 102.55 does not cover Mireles's permanent total disability claim.

¶ 63. We conclude that Wis. Stat. §§ 102.52, 102.53, and 102.55 do not cover a claim for permanent total disability based on a combination of scheduled and unscheduled injuries. In *Langhus*, the court of appeals reached the same conclusion when it observed:

> We note that LIRC's interpretation does not preclude a claimant who can prove total disability, stemming from both scheduled and unscheduled injuries, from receiving lifetime benefits. Section 102.44(2), Stats., specifically provides that certain combinations of scheduled injuries are deemed to constitute permanent total disability. In other situations, DWD is directed "to find the facts." There is no reason, therefore, that a claimant with both scheduled and unscheduled injuries could not establish facts that would allow LIRC to award benefits for permanent total disability under § 102.44(2). The burden of making that showing, however, rests on the claimant.

*Langhus*, 206 Wis. 2d at 505 n.9.

¶ 64. This conclusion is not undermined by two previous decisions, *Mednicoff*, 54 Wis. 2d 7, and *Vande Zande*, 70 Wis. 2d 1086. In *Mednicoff*, this court confronted the issue of whether scheduled injuries could form the basis for a loss of earning capacity claim. *Mednicoff*, 54 Wis. 2d at 14. The applicant in *Mednicoff* suffered from a permanent partial disability, based on

a combination of scheduled injuries. *Id.* at 11. She claimed agency error because the trier of fact did not consider her claim for loss of earning capacity. *Id.* at 11–12. This court determined that the applicant could not receive compensation for loss of earning capacity because loss of earning capacity is inherent for injuries in the schedule. *Id.* at 12. The court found that only the specific enumerated combinations of scheduled injuries qualified under Wis. Stat. § 102.44(2) and that "all other cases of multiple scheduled or relative injuries are to be compensated according to the provisions of § 102.53." *Id.* at 14. The court's holding did not preclude a combination of scheduled and unscheduled injuries constituting permanent total disability.

¶ 65. *Vande Zande*, 70 Wis. 2d at 1086, was another case involving multiple injuries amounting to a permanent partial disability. The applicant sustained "a skull fracture, loss of sense of taste and smell, facial paralysis, intermittent headaches, dizziness, and vertigo, and 100 percent loss of hearing in his left ear." *Id.* at 1091. The agency awarded the applicant 20 percent permanent partial disability and a scheduled award for deafness of 55 weeks. *Id.* at 1091–92. The applicant contended that the deafness caused the other symptoms and that he deserved an award of 40 percent permanent partial disability. *Id.* at 1091. He asserted that the schedule should not apply to his case. *Id.* at 1091. We disagreed and ruled that the administrative agency correctly applied the schedule to the applicant's situation. *Vande Zande*, 70 Wis. 2d at 1093.

¶ 66. Both *Mednicoff* and *Vande Zande* affirm the explicit language of Wis. Stat. § 102.44(4) that where the permanent disability is covered by Wis. Stat. §§ 102.52, 102.53, and 102.55, such sections shall govern. Wis. Stat. § 102.44(4). Moreover, "in no case shall

the percentage of permanent total disability be taken as more than 100 percent." *Id.* Nonetheless, these cases do not control a claim of permanent total disability not covered by the three sections.

¶ 67. *Langhus* makes the point that eligibility to make a claim and proof of a claim are different. In *Langhus*, the applicant claimed permanent total disability. Langhus injured his knee at work, *Langhus*, 206 Wis. 2d at 497, an injury governed by the schedule. Wis. Stat. § 102.52. Later, Langhus reinjured his knee and shoulder outside of work. *Id.* Langhus subsequently developed an unscheduled back injury as a result of a limp from the knee injury. *Id.* Langhus claimed he suffered total and permanent disability as a result of the back, leg, and shoulder injuries. *Id.*

¶ 68. LIRC denied Langhus's claim for permanent total disability benefits because he did not demonstrate what portion of his disability could be attributed to his back injury. *Id.* at 506. According to the court of appeals, LIRC did not contend that Langhus could not qualify for permanent total disability benefits under Wis. Stat. § 102.44(2). *Id.* at 505–06. The court of appeals found "that LIRC's interpretation [did] not preclude a claimant who can prove total disability, stemming from both scheduled and unscheduled injuries, from receiving lifetime benefits [under Wis. Stat. § 102.44(2)]." *Langhus*, 206 Wis. 2d at 505 n.9. Presumably, LIRC wanted Langhus to show that his disability was caused in part by an unscheduled injury, so that compensation for loss of earning capacity was not awarded for an injury caused either significantly or wholly by a scheduled injury. *Id.* at 505–06. "LIRC did not exceed its authority in placing the burden on Langhus to prove that an ascertainable portion of his

total disability was attributable to other than a scheduled injury."[14] *Id.* at 506.

¶ 69. Our holding today does not affect the absolute exclusiveness of scheduled benefits in cases of permanent partial disability. *See Langhus*, 206 Wis. 2d at 505; *Vande Zande*, 70 Wis. 2d at 1093; *Mednicoff*, 54 Wis. 2d at 14. This includes the apportionment guidelines for permanent partial disability cases from *Vande Zande*, 70 Wis. 2d at 1091–93, and *Hagen v. LIRC*, 210 Wis. 2d 12, 23, 563 N.W.2d 454 (1997). An injured worker with a permanent partial disability attributable to both a scheduled and unscheduled injury still will be unable to recover beyond the schedule limits for that portion of the disability attributable to the scheduled injury. *Hagen*, 210 Wis. 2d at 23.

¶ 70. Our interpretation of Wis. Stat. § 102.44(6)(b) and 102.44(2) does not guarantee Mireles or any applicant additional benefits. Our interpretation merely permits applicants in the unusual circumstances here to state claims that the department may consider and that the applicants must prove. Ultimately, the department finds the facts.

CONCLUSION

¶ 71. We find that the language of Wis. Stat. § 102.44(6)(b) allows the department to reopen a Worker's Compensation award to account for loss of earning capacity from an unscheduled injury, even if a scheduled injury causes the termination of an employment relationship. We also find that Mireles can qualify for permanent total disability benefits under

---

[14] As noted in Mireles's Reply Brief, the issue of apportionment is not before the court.

Wis. Stat. § 102.44(2) based upon the combination of her injuries, if she can prove such disability to the department. We therefore remand for further agency proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded.